ALEXANDER B. TRUEBLOOD (WA Bar No. 50612)
TRUEBLOOD LAW FIRM
1700 Seventh Ave, Suite 2100
Seattle, Washington 98101-1360
Telephone:  (206) 707-9685
Facsimile:  (206) 832-4676

Attorneys for Plaintiff
DANIEL SOGN

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON – SEATTLE DIVISION

DANIEL J. SOGN,

        Plaintiff,

   vs.

ALASKA USA FEDERAL CREDIT
UNION, and CAREFUL ASSET
RECOVERY SERVICE,
INCORPORATED,

        Defendants.

) Case No:  2:17-CV-0432 MJP
)
)
) **PLAINTIFF'S OPPOSITION TO**
) **MOTION FOR SUMMARY**
) **JUDGMENT (REVISED)**
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

# I.  INTRODUCTION

The key facts of this wrongful repossession case are simply left out by defendants in their moving papers: that Jeremie Kaufman threatened plaintiff with violence, tried to enter plaintiff's home while the family was sleeping, falsely threatened to report that plaintiff was armed and dangerous to the police, lied repeatedly during the repossession, and is a four time convicted criminal. Defendants also leave out that Kaufman was suspended and ultimately fired for this very incident, after his own bosses determined he had breached the peace.  On the other hand, plaintiff Daniel Sogn is a decorated veteran of the Iraq and Afghanistan wars, whose unique vulnerabilities due to his combat experience resulted in severe emotional distress from this incident, including nightmares of past traumas of war. As Daniel put it at his deposition: "He took something from me, and it wasn't just my car. It was -- this peace that I had at that house, it's gone now. The safe spot that I had, that I had tried to build for my wife and I and our daughter and our two dogs, was taken from me that night."  Trueblood Decl., Exh. 1, p. 58:17-22.

This motion also amounts to a trial by ambush, and plaintiff moves to strike all of defendants' evidence under FRCP 37(c). <u>None</u> of the defense witnesses who now submit declarations were disclosed in initial disclosures.  <u>None</u> of the key documents were disclosed either, including the alleged recording of plaintiff, and Alaska USA's transaction log. Plaintiff specifically asked for these items in discovery and was told they didn't exist, or that Alaska USA objected.  Then defense counsel dumped them all on plaintiff's counsel just days before the discovery cutoff.  Defendant Car Service L.L.C. never even served disclosures.

The legal issues raised by defendants also fail.  The evidence is in conflict concerning whether and when the vehicle was "hooked up." Alaska USA cannot escape liability for breach of the peace by using independent contractors, because it had a nondelegable duty to avoid a breach of the peace, and its own contract recites that its repossessors are agents. Emotional distress is a recoverable form of damage

1

on all of plaintiff's claims except breach of contract.  Plaintiff has satisfied all elements of his CPA claim, because the Washington courts have decided that wrongful repossessions are a *per-se* violation of the CPA and a public concern.

## II.  STATEMENT OF FACTS

 On July 23, 2013, plaintiff refinanced an existing loan he had with General Motors, with defendant Alaska USA. After making payments for years, Mr. Sogn began to fall behind in about November, 2016. Alaska USA decided to repossess the vehicle, but never gave Sogn advance warning. Sogn Decl., ¶ 3. Alaska USA hired a national repossession agency, Par, Inc., to repossess Mr. Sogn's car. Trueblood Decl., Exh. 3, p. 24:20-22; 26:7-8; Exh. 5. Par then hired Car Service, L.L.C. to conduct the physical repossession. Trueblood Decl., Exh. 19, p. 4, Rog 4; Exh. 3, p. 64:24-65:10. The Par-Alaska USA contract recites that Par and Car Service are agents of Alaska USA. Trueblood Dec., Exh. 5, p. 8, ¶ 8; p.1, ¶ 3.

At 2:30 a.m. on January 20, 2017, Daniel, his wife Allison, and their infant daughter were asleep in their home in Seattle. Daniel and Allison were awakened by the front door bell. Daniel got out of bed to investigate. Defendant Jeremie Kaufman, an employee of Car Service L.L.C., was at the front door, clad in black clothes and a hoody, with no uniform. Kaufman told Sogn he needed the key to the Lexus because he was there to repossess the vehicle, but did not identify his company.  Plaintiff, alarmed that a total stranger was demanding his car keys at 2:30 a.m., replied "What!? No!!" and shut the door. Sogn Decl., ¶ 3. However, Kaufman did not leave, as he was required to do by law and company policy, upon receiving an objection. Trueblood Decl., Exh. 2, p. 39:10-20.

Kaufman knocked on the door because he had been unable to hook the vehicle to the tow truck, and needed the keys first, to get it out of the enclosed space it was in.  Daniel's car was parked head-in against his perimeter fence in the back alley, tightly enclosed on both sides by fencing and some heavy wood and stones that were in his alley driveway. The car was parked close to the front fence,

2

1    and about 12 inches from the fence at the right side.  Sogn Decl., ¶ 4. Car Service's

2    owner testified that the minimum clearance needed to insert this particular dolly

3    under the front wheels of Sogn's car was 18 inches on all sides, which Kaufman

4    didn't have.  Trueblood Decl., Exh. 2, p. 24:13-26:12.

5        Daniel's Lexus was an all-wheel drive model.  An all-wheel drive cannot be

6    towed by merely lifting the back wheels, as the usual rear-wheel drive car could be.

7    Instead, an all-wheel drive has to have the front wheels suspended by a special

8    apparatus, called a dolly, before the car can be moved. Sogn Decl., ¶ 4. Trueblood

9    Decl., Exh. 3, p. 62:1-16, 67:7-17. A dolly is essentially a flat cart with its own

10   wheels. Towing an all-wheel drive car with only rear wheels lifted, and with front

11   wheels dragging along the ground, would destroy the car's transmission, since the

12   front wheels are locked by the car's drivetrain. Therefore, in order to fully hook up

13   the vehicle, Car Service LLC had to not only lift the back end, but also place two

14   dollies under the front wheels, before it could drive even one foot.  The dollies had

15   to be inserted at the sides of the vehicle. Trueblood Decl., Exh. 3, p. 64:2-23.  There

16   was not enough space in the alley along the sides of the car for this.  Sogn Decl., ¶

17   4. Kaufman therefore demanded the keys from plaintiff.

18       After Daniel's objection at the front door, he noticed that Kaufman was in his

19   backyard, which he had entered through a closed gate.  Daniel went outside through

20   his back door, and Kaufman started yelling at him.  Kaufman refused to identify

21   himself.  Kaufman demanded Daniel's keys again, and Daniel refused. Kaufman

22   then yelled that if Daniel tried to enter his vehicle to recover his possessions, he

23   would use physical force to stop him. Sogn Decl., ¶¶ 5-6. Plaintiff kept his distance,

24   and Kaufman then broke into plaintiff's vehicle using tools.  In doing so, he set off

25   a loud alarm which disturbed the peace. Sogn Decl., ¶ 7.

26       Now in the alley, plaintiff went to the passenger side of his vehicle to collect

27   his belongings. Kaufman then yelled to his partner in the tow truck (subsequently

28   identified as one Dustin Maryman, who was not an employee of Car Service) to call

3

1   the police and tell them Daniel was ex-military and armed.  Daniel was not armed.

2   Maryman replied that "Officer Johnson" was on his way. Daniel decided to retreat

3   to his home, to avoid further confrontation and further disturbance of his neighbors.

4   In fact, the repo men never called the police.  Sogn Decl., ¶¶ 7-8.

5        Daniel complained to Alaska USA about the repossession, who in turn

6   complained to Par, Inc., who in turn complained to Car Service L.L.C.  Trueblood

7   Decl., Exh. 2, p. 28:4-22; Exh. 3, p. 57:14-58:3. Car Services's owner Dan Cody,

8   interviewed Kaufman and determined that "the percentages" favored plaintiff's

9   version of events. Trueblood Decl., Exh. 2, p. 39:21-40:25. Car Service wrote a

10  March 23, 2017 letter of reprimand to Kaufman about this incident, and suspended

11  him until he re-took a breach of the peace training course.

12       Tellingly, the suspension letter is entitled "Breach of the Peace Violation,

13  Consumer Finance Protection Violation." It states: (1)"This violation of law and

14  company policy places this company in jeopardy with numerous legal jurisdictions

15  and the trust and confidence of our clients"; and (2) Kaufman's "reasoning for this

16  blatant violation . . . is the vehicle being tucked in an alley, room to secure the

17  dollys for vehicle safety almost non-existent, and that the vehicle was all wheel

18  drive making the securing of the vehicle very difficult." The letter suspends

19  Kaufman until he re-takes the training course, and states he will be fired for future

20  lapses in honesty or violations of company policy.  Trueblood Decl., Exh. 6.

21       Kaufman refused to re-take the training course, and was later fired for this

22  and other misconduct. Trueblood Decl., Exh. 2, p. 35:5-24; Exh. 3, p. 12:21-13:25.

23  Kaufman is a four-time criminal, with convictions for criminal trespass (breaking

24  into a pharmacy for drugs), twice receiving stolen merchandise (hot-wiring a stolen

25  car, and using a stolen credit card), and theft.  See Req. for Jud. Notice., Exh. 1-4.

26       III.  MOTION TO STRIKE AND EVIDENTIARY OBJECTIONS

27       Plaintiff moves to strike all evidence offered by the defense, under FRCP

28  37(c) and other evidentiary objections. FRCP 37(c) states: "If a party fails to

4

1    provide information or identify a witness as required by Rule 26(a) or (e), the party

2    is not allowed to use that information or witness to supply evidence on a motion, at

3    a hearing, or at a trial, unless the failure was substantially justified or is harmless."

4    A.    None of Defendants' Witnesses Were Disclosed

5        *Not one* of defendants' witnesses (Nazir, Scharer, and Varhas) is listed on

6    Alaska USA's initial disclosures dated June 5, 2017.  Trueblood Decl., Exh. 7.

7    Defendant Car Service LLC made no initial disclosures.  Trueblood Decl., ¶ 21.[1]

8        Plaintiff asked for all percipient witnesses in an interrogatory dated April 13,

9    2018, which requested "all persons with knowledge of the circumstances of the

10   repossession of plaintiff's vehicle," to which Alaska USA responded on May 15,

11   2018 by listing only Jeremie Kaufman and Dustin Maryman (not Scharer, Nazir, or

12   Varhas). Trueblood Decl., Exhs. 8-9, Interrogatory No. 3.  Alaska USA

13   supplemented this interrogatory response on June 19, 2018, ten days before the

14   discovery cutoff, but still did not disclose Scharer or Nazir. Trueblood, Exh. 10.

15       Roger Varhas. Defendants have offered an alleged recorded conversation of

16   Mr. Varhas, and his log entries, but he was not disclosed in any initial disclosures,

17   nor in Alaska USA's first response to plaintiff's April 13, 2018 interrogatory,

18   asking it to identify "all persons with knowledge of the circumstances of the

19   repossession of plaintiff's vehicle." Trueblood Decl., Exhs. 8-9, Rog No. 3.

20       The first mention of this witness was in Alaska USA's supplemental

21   interrogatory responses served on June 19, 2018, just 90 minutes before Alaska

22   USA's 30(b)(6) deposition started, which stated that plaintiff had allegedly had a

23   conversation with a "Mr. Varhas" on January 23, 2017 about when the vehicle was

24   hooked up.  Trueblood Decl., ¶ 11, Exh. 10, p. 3, Interrogatory 1.  The interrogatory

25

26   [1] Careful Asset Recovery Service, Incorporated was dismissed from this action.  This
     corporation went into bankruptcy and was dissolved in 2013, four years before the
27   repossession.  Trueblood Decl., Exh. 2, p. 12:7-13:15, 16:8-14; Exh. 19, Rog 2; Exh. 3,
     p. 10:7-20; RJN Exh. 6. Careful Asset Recovery Service, Incorporated provided initial
28   disclosures to plaintiff, and these too failed to list the witnesses or documents upon
     which Car Service L.L.C. and Alaska USA now rely as evidence.  Trueblood Decl.,
     Exh. 18.                              5

1  response didn't disclose the last name of "Mr. Varhas," nor whom he worked for,

2  nor his contact information.  Nor could plaintiff's counsel confirm that there

3  existed an alleged recorded conversation between Varhas and plaintiff, until seven

4  days later, when it was suddenly produced on June 26, 2018.  Trueblood Decl., ¶

5  11. There was no time to notice Mr. Varhas' deposition, with only three days

6  remaining before the discovery cutoff. Id.

7      <u>Athar Nazir</u>. The first time plaintiff learned of Mr. Nazir's existence was on

8  June 19, 2018, when Alaska USA produced him for deposition as its FRCP

9  30(b)(6) witness.  Trueblood Decl., ¶ 5.  This was only 10 days before the

10  discovery cutoff.  <u>Id</u>.  The 30(b)(6) deposition notice did not list as a topic of

11  testimony the degree of control by Alaska USA over Car Service LLC (i.e. the

12  agency-independent contractor dispute now front and center in this motion).

13  Trueblood Decl., Exh. 11. Yet Mr. Nazir is now Alaska USA's sole witness on this

14  issue, declaring that Alaska USA had no control whatsoever over Car Service,

15  LLC, Kaufman, or Maryman.  Nazir Decl., ¶¶ 13-20.  Had plaintiff's counsel

16  known of Mr. Nazir's existence and had a summary of what he planned to testify

17  about at start of this lawsuit, as was required by Rule 26(a), plaintiff would have

18  noticed Mr. Nazir's deposition as an individual or included the control/agency topic

19  in the 30(b)(6) deposition notice.  As it was, plaintiff did not learn of Nazir's

20  importance on the agency issue until receiving the motion for summary judgment

21  on June 25, 2018, four days before the discovery cutoff. Trueblood Decl., ¶ 5.

22      Alaska USA's initial disclosures listed "Alaska USA Federal Credit Union"

23  without listing Nazir.  This was insufficient under Rule 26(a), which requires a

24  party to designate the name and address "of each *individual*" likely to have

25  discoverable information. Designating an entity does not comply, since it is

26  individuals who testify for corporations at trial or summary judgment.  Moreover,

27  Alaska USA violated Rule 26(a)(1)(A)(i) by failing to disclose that one of the

28

6

1    "subjects of discoverable information" was the degree of control Alaska USA has

2    over its repossession agents.  Yet this is now the main subject of Nazir's testimony.

3         <u>Karleen Scharer</u>.  Ms. Scharer is defendants' litigation counsel, and was

4    never disclosed under Rule 26 or in discovery, yet she is now defendants' chief

5    witness on MSJ.  Her declaration attempts to authenticate various documents from

6    the defendants' files, including recordings and logs. She is not the custodian of

7    records for any defendant, and plaintiff never had a chance to depose her.

8    B.    <u>Defendants' Evidence Is Barred By FRCP 37(c), And Not Admissible</u>

9         Plaintiff moves to strike and exclude the following evidence based on FRCP

10   37(c), and also based on the evidentiary objections below (subsection 3).

11        *1. Recording Of Roger Varhas*

12        Defendant Alaska USA did not disclose the existence of this recording in its

13   June 5, 2017 initial disclosures. Trueblood Decl., Exh. 7, p. 4. Defendant first

14   produced this recording on June 26, 2018, three days before the discovery cutoff,

15   after this motion was already filed, and seven days after plaintiff had already

16   deposed Alaska USA's FRCP 30(b)(6) witness on June 19, 2018. Trueblood Decl.,

17   ¶ 11, and Exh. 12. Plaintiff asked Alaska USA for all "written or recorded

18   statements or declarations of any witness or the parties herein" in his April 13,

19   2018 first set of document demands, plus all documents supporting any defenses.

20   Trueblood Decl., Exh. 14, Demands 17 and 19. Defendant Alaska USA responded

21   on May 14, 2018 that "all responsive documents have been produced through the

22   course of discovery."  Trueblood Decl., Exh. 15, Demands 17, 19.  This was untrue.

23        Plaintiff learned for the first time that a recording of plaintiff allegedly *might*

24   exist, on June 19, 2018, ten days before the discovery cutoff, at the deposition of

25   Athar Nazir, Alaska USA's FRCP 30(b)(6) witness. Nazir was designated as the

26   person most knowledgable at Alaska USA as to "The communications, oral,

27   written, or electronic, between the deponent and plaintiff from 60 days prior to the

28   repossession, through today." Trueblood Decl., Exh. 11, p. 2, topic 9.  However,

7

1 plaintiff could not cross-examine Nazir about any recordings, because he was

2 ignorant of them. He testified that all conversations with plaintiff were recorded at

3 Alaska USA as a matter of course, but he had not listened to any recordings, and

4 didn't even know if they still existed. Trueblood Decl., Exh. 4, p. 109:17-110:10.

5 Alaska produced the recordings a week later, three days before discovery closed.

6        *2.  Alaska USA's Transaction Log*

7        Alaska USA did not disclose this document, attached as Exhibit 3 to the

8 Scharer Declaration, in its initial disclosures. Trueblood Decl., Exh. 7, p. 4.  The

9 disclosures mention only "A copy of Alaska USA's file" for Sogn, but the

10 transaction log is computerized system data and not part of an individual

11 borrower's file.  Alaska USA produced this document for the first time on June 19,

12 2018, just 90 minutes before the deposition of its 30(b)(6) witness was to take

13 place, leaving plaintiff's counsel scrambling to review and understand it before the

14 deposition started.  Trueblood Decl., ¶ 14, Exh. 13.  Plaintiff's counsel was not able

15 to effectively cross-examine Nazir on this prolix document with all its coding, in

16 the middle of a deposition, and so stated on the record. Trueblood Decl., Exh. 4, p.

17 116:10-25.

18        In aggravation, plaintiff had *specifically* sought this transaction log in his

19 April 13, 2018 document demands, by requesting "Any document which constitutes

20 your log or other record of the work performed or contacts made concerning

21 plaintiff or plaintiff's vehicle."  Trueblood Decl., Exh. 14, Demand No. 10.  Alaska

22 USA refused to produce the log, objecting that it was privileged, and not

23 proportional to the needs of the case.  Trueblood Decl., Exh. 15, Demand No. 10.

24 However, Alaska USA suddenly produced the log on June 19, 2018, just before its

25 30(b)(6) deposition, along with a supplemental discovery response agreeing to

26 produce the document.  Trueblood Decl., ¶ 14, Exhs. 13 and 16, Demand No. 10.

27 The sandbagging was effective: plaintiff had no time to effectively cross-examine

28

Alaska USA's witness on the log, and no time before the discovery cutoff to notice depositions of other Alaska USA's employees listed in the log, including Varhas.

*3. Evidentiary Objections (Sharer and Nazir Declarations, and Exhibits)*

**Scharer Exhibits 1-2 (videos), and paragraphs 3-4.** Obj. #1: FRE 901(a). Unauthenticated, no personal knowledge. A witness authenticating a recording must have contemporaneously participated in the conversation. US v. Matta-Ballesteros, 71 F.3d 754, 768 (9th Cir. 1995); US v. Scully, 546 F.2d 255, 269 (9th Cir. 1976) (proponent of recording must show chain of custody, and no alteration). Obj. #2: Inadmissible hearsay, FRE 802. Alleged statements of Jeremie Kaufman on the videos are offered for their truth.

**Scharer Exhibit 3 (log), paragraph 5**. Obj. #3: FRE 901(a). No authentication, lack of personal knowledge. Obj. #4: Inadmissible Hearsay, FRE 802. The log entries of Roger Varhas, purporting to recount conversations he had with plaintiff, are double hearsay. Obj. #5: Lack of personal knowledge and more prejudicial than probative because if plaintiff told Varhas the vehicle was "hooked up" at the time of the doorbell ring, he had no personal knowledge of that, since he had just awakened from sleep inside his home. Sogn Decl., ¶ 3.

**Scharer Exhibit 4 (audio recording), paragraph 6**. Obj. #6: FRE 901(a). Not authenticated by custodian, no chain of custody, and no identification of speakers on the tape, by someone with personal knowledge. See Matta and Scully cases, above. Obj. #7: FRE 802. Recording contains inadmissible hearsay statements of Roger Varhas, an employee of Alaska USA. Obj. #8: Lack of personal knowledge and more prejudicial than probative (see Obj. #5).

Evidence Objections (Nazir). Paragraphs 14, 16, 18, and 20 of Nazir's declaration are conclusory, and lack personal knowledge. Nazir testified he had no knowledge of the Par – Car Service relationship at depo. See this Brief, p. 21:13-14. His declaration is a sham.

C.      FRCP 37(c) Is Self-Executing

FRCP 37(c)(1) is intended to put teeth into the mandatory disclosure requirements of FRCP 26(a).  Ollier v Sweetwater Union High School District, 768 F.3d 843 (9th Cir. 2014).  It is a self-executing sanction, designed to provide a strong inducement for disclosure.  Risinger v. SOC, LLC, 306 FRD 655 (D. Nev. 2015).  Because it is self-executing, other parties have a right to expect that only disclosed witnesses will be used to support claims and defenses, and should not have to second guess whether a disclosing party purposefully or accidentally omitted a witness.  Rhodes v. Sutter Health, 949 F.Supp. 2d 997 (E.D. Cal. 2013).

Evidence and witness exclusion is automatic and no showing of bad faith or callous disregard is necessary.  Rack and Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592 (4th Cir. 2003); Happel v. Walmart Stores, Inc., 602 F.3d 820 (7th Cir. 2010).  Unlike a motion to compel discovery, there is no obligation to confer before objecting. Fulmore v. Hope Depot, USA, Inc., 423 F. Supp2d 861 (S.D. Ind. 2006); If the evidence is offered for both impeachment and substantive use, it still must be excluded.  Klonoski v. Mahlab, 156 F.3d 255 (1st Cir. 1998).

Rule 37(c) applies equally to inadequate discovery responses, as to initial disclosures. Accordingly, a document which is responsive to a discovery request and not produced may not be considered on summary judgment.  Shepard v. Frontier Communications Services, Inc., 92 F.Supp.2d 279 (S.D. N.Y. 2000). Witnesses requested in interrogatory responses, but not disclosed, are automatically excluded.[2]

FRCP 37(c) may be avoided only if the party proffering the evidence can establish that "the failure was substantially justified or is harmless."  FRCP

---

[2] Williams v. Johanns, 498 F. Supp. 2d 113 (D.D.C. 2007)(excluding witnesses after plaintiff failed to respond to interrogatory asking for names of potential witnesses); Hoyle v. Freightliner, LLC, 650 F.3d 321 (4th Cir. 2011)(precluding party from using a witness who was not disclosed in response to interrogatory seeking identities of witnesses with knowledge).  Even if identities of witnesses are disclosed in discovery, if they are not on the initial disclosures, the witness should be excluded. Wallace v. USAA Life General Agency, Inc., 862 F.Supp.2d 1062 (D. Nev. 2012).

1   37(c)(1).  Substantial justification is only a "narrow escape hatch." <u>Bern Unlimited,</u>

2   <u>Inc. v. Burton Corp.</u>, 95 F.Supp.3d 184 (D. Mass. 2015).  The burden is on the

3   party facing the sanctions to demonstrate that failure to comply with Rule 26 was

4   substantially justified or harmless. The objecting party is not required to articulate

5   how they would be prejudiced. <u>Torres v. City of Los Angeles</u>, 548 F.3d 1197 (9th

6   Cir. 2008).

7       In the Ninth Circuit, a nondisclosure is not harmless if modification of the

8   trial schedule, a new briefing schedule, or reopening of discovery is necessary.

9   <u>Hoffman v. Const. Protective Services, Inc</u>., 541 F.3d 1175 (9th Cir. 2008).  A

10  district court is not required to delay proceedings to accommodate a party's failure

11  to disclose a relevant witness, and should simply exclude those witnesses on

12  summary judgment.  <u>Malone v. Ameren UE</u>, 646 F.3d 512 (8th Cir. 2011).

13      The district courts have regulary applied FRCP 37(c) to exclude undisclosed

14  audio and videotapes, nondisclosures which are not harmless.[3]  The courts have

15  also excluded evidence produced for the first time just before motions for summary

16  judgment, or just before the discovery cutoff, as was also done here.[4]

17      Finally, FRCP 37(c) applies to exclude undisclosed document authentication

18  witnesses[5], such as Karleen Scharer, who purports to authenticate virtually every

19

20  _____

21  [3] <u>Wilson v. Bradlees of New England, Inc.</u>, 250 F.3d 10 (1st Cir. 2001)(excluding
    videotapes which defendant did not disclose during discovery); <u>Hoffman v. Caterpillar,</u>

22  <u>Inc.</u>, 368 F.3d 709 (7th Cir. 2004)(videotape); <u>Aerotech Resources, Inc. v. Dodson</u>
    <u>Aviation, Inc.</u>, 191 F.Supp.2d 1209 (D. Kan. 2002).

23  [4] <u>RBS Citizens, N.A. v. Husain</u>, 291 FRD 209 (N.D. Ill. 2013)(disclosure of a witness
    two days before the discovery cutoff); <u>Gonzalez v. State of Florida Department of</u>

24  <u>Management Services</u>, 124 F.Supp. 3d 1317 (S.D. Fla. 2015)(holding onto evidence
    until summary judgment, then using that witness as its sole evidence for the motion,

25  and other side not having chance to depose, required exclusion); <u>Solid 21, Inc. v.</u>
    <u>Hublot of America</u>, 109 F.Supp.3d 1313 (C.D. Cal. 2015)(disclosure of new fact

26  witnesses at the time of summary judgment places the opposing party at a disadvantage
    and constitutes unfair surprise); <u>Malone v. Ameren UE</u>, 646 F.3d 512 (8th Cir.

27  2011)(district court properly denied affidavits offered on MSJ, and is not required to
    delay proceedings to accommodate a party's failure to disclose a relevant witness).

28  [5] <u>Gaylor v. Greenbriar of Dhlonega Shopping Center, Inc.</u>, 975 F.Supp.2d 1374 (ND
    Ga. 2013)(failure to identify witness who later authenticated surveillance videotape,

1    document offered by defendants. The fact that Scharer is opposing counsel does not

2    excuse the failure to disclose her. <u>Ricks v. BMEzine.com</u>, LLC, 727 F.Supp.2d

3    936, 950 (D. Nev. 2010)("A party's counsel is not usually a witness for that party in

4    the same action").

5          These nondisclosures were not harmless or substantially justified, but

6    involved long delay, real surprise and prejudice.  Indeed, Defendants now rely

7    exclusively on the undisclosed evidence in their current attempt to dismiss the case.

8    Alaska USA was perfectly aware of these witnesses, and had the recordings and

9    documents in its possession from the outset of the lawsuit, yet didn't mention them

10   in disclosures or discovery. Car Service L.L.C. totally failed to serve initial

11   disclosures at all. This is a record of bad faith, but mere negligence leads to the

12   same result under FRCP 37(c).

13          IV.  THE BREACH OF THE PEACE IS FACTUALLY DISPUTED

14   A.    <u>Defendants Failed To Meet Their Burden of Producing Admissible Evidence</u>

15          After the Court rules on plaintiff's motion to strike, plaintiff believes there

16   will be no evidence before the court supporting defendants' motion.  "If a moving

17   party fails to carry its initial burden of production, the nonmoving party has *no*

18   *obligation to produce anything*, even if the nonmoving party would have the

19   ultimate burden of persuasion at trial." <u>Nissan Fire v. Fritz</u>, 210 F.3d 1099, 1102-3

20   (9th Cir. 2000).

21   B.    <u>The Parties Vigorously Dispute Whether Kaufman Had Completed Hooking</u>

22          <u>Up Plaintiff's Vehicle Before Plaintiff Objected</u>

23          Even if the Court admits the two audio/video recordings (Exhibits 1-2,

24   Scharer Decl.), which are unauthenticated and hearsay, the parties dispute whether

25   Kaufman had fully hooked-up plaintiff's vehicle when plaintiff first objected to the

26   repossession at the front door. There is no testimony from Kaufman himself, so

27

28   discovered two weeks before MSJ, required exclusion); <u>Niles v. American Airlines,</u>
     <u>Inc.</u>, 563 F.Supp.2d 1208 (D. Kan. 2008)(failure to disclose documents unfairly
     deprives other party of opportunity to depose records custodians).

1   defendants rely exclusively on his hearsay statements in the two videos.  On the

2   other hand, plaintiff has convincing and admissible evidence that the vehicle was

3   *not* hooked up and ready to tow at the time of objection. The importance of this

4   issue is that a repossessor has a duty to immediately retreat upon objection by the

5   borrower. Roberts v. Speck, 169 Wash. 613, 616 (Wash. 1932)(repossessor must

6   resort to process of law when party refuses to surrender car); Stone Machinery

7   Company v. Kessler, 1 Wn. App. 750, 754-55 (Wash. App. 1970)(car owner has

8   right to obstruct repossession, and repossessor must retreat).

9       The first question is, what does fully "hooked up" mean, for purposes of

10  breach of the peace?  For an all-wheel drive car, this has to mean actually capable

11  of towing, i.e. that all four wheels are secured and the tow truck could actually

12  drive away.  In Burgin v. Universal Credit Company, 2 Wn.2d 364 (1940).  The

13  repo man claimed he had obtained possession of the car by securing a chain to the

14  front bumper, which was necessary to hoist the car up.  The car was "fastened, but

15  not completely fastened" at the point the car owner appeared and objected.  The

16  court held that putting the chain on the bumper "was no more a repossession in fact

17  than if he had cast the chain into the car. The peaceable repossession authorized by

18  law must be actual and not merely symbolic." Id. at 374.  Plaintiff submits that

19  hoisting up the rear end of plaintiff's vehicle (if that happened, as there is no

20  admissible evidence on this point) would be merely symbolic and not an actual

21  possession of an all-wheel drive car. Id. at 374. Sogn's front wheels had not been

22  dollied at the time of his objection, and the car was still untowable.

23      The best evidence that the Lexus was not fully hooked up before Sogn

24  objected, is the fact that Jeremie Kaufman had to come to plaintiff's door at 2:30

25  a.m. in the first place, to ask for the keys.  If he had been able to hook up the

26  vehicle in the alley, he would have done so and just driven away without plaintiff

27  ever knowing.  But he physically could *not* do so, because the vehicle was all-

28  wheel drive and there was insufficient space to dolly the front wheels. Sogn Decl.,

13

¶ 4.  So he knocked on plaintiff's door at 2:30 a.m. and demanded the keys, which he needed to turn on the car, back it up, and get the dollies on.

Kaufman later admitted to his employer that he had rung the doorbell beause he had insufficient space to insert the dollies.  Trueblood Decl., Exh. 17.  This means that when Kaufman knocked on the door, the vehicle could *not* have been hooked up and ready to tow.  Plaintiff objected to the repossession at that time, and upon objection, Kaufman immediately had a legal duty to leave.

More evidence in plaintiff's favor is that Kaufman kept demanding the keys a few minutes *after* the first door knock, in plaintiff's back yard, which shows that at that time, he *still* had not secured or dollied plaintiff's vehicle. Sogn Decl., ¶ 5. This was when Kaufman threatened to beat up plaintiff. Sogn Decl., ¶ 6. Kaufman then broke into plaintiff's vehicle with a tool.  Sogn Decl., ¶ 7.  The only reason to break into the car was to hot-wire it, so it could be reversed and then dollied in the clear. Kaufman was previously convicted of hot-wiring a car.  RJN Exh. 5. There were no drag marks after the repossession, further indicating the car may have been hot-wired (and never dollied). Sogn Decl., ¶ 4.

Another fact tending to prove that Kaufman did not have the vehicle hooked up before Sogn objected, is that Kaufman's own bosses at Car Service LLC determined he had breached the peace. The March 23, 2017 letter of reprimand to Kaufman about this incident informed him of Car Service LLC's conclusion, after considering his statement and all the facts, that he had violated the law:

   • The letter is entitled "Breach of the Peace Violation, Consumer Finance Protection Violation."  Trueblood Decl., Exh. 6.

   • The letter states "This violation of law and company policy places this company in jeopardy with numerous legal jurisdictions and the trust and confidence of our clients." Trueblood Decl., Exh. 6.

   • The letter states that Kaufman's "reasoning for this blatant violation . . . is the vehicle being tucked in an alley, room to secure the dollys for vehicle safety

14

1  almost non-existent, and that the vehicle was all wheel drive making the securing of
2  the vehicle very difficult." Trueblood Decl., Exh. 6.

3       • Kaufman is suspended until he re-takes the training course, and will be fired
4  for future lapses in honesty or violations of company policy.

5       Defendants offer no testimony from Kaufman, so they rely on the two
6  unauthenticated videos, which contain (allegedly) Kaufman's inadmissible hearsay
7  statements. Plaintiff will discuss the videos here in the unlikely event they are
8  admitted into evidence. The first video has the following exchange:

9       First Voice: "I need a key for the Lexus, it's being repossessed."

10      Second Voice: "What?!  No!"

11      First Voice:  "Well, it's on my tow truck… so."

12      Assuming the first voice is Kaufman, his statement that "Well, it's on my
13  tow truck" is inadmissible hearsay.  But even if that statement were considered,
14  Kaufman was lying. He could not physically have had Sogn's car fully hooked up,
15  because he had insufficient space to dolly the vehicle. Sogn Decl., ¶ 4. According
16  to his own statement to his employer, that is why he had to knock on plaintiff's
17  door in the first place. Trueblood Decl., Exh. 6. Kaufman was being paid on
18  commission by the repossession, and had an incentive to complete the repossession
19  without returning another day. Trueblood, Exh. 3, p. 36:15-37:22.

20      In the second video, Kaufman allegedly says "I'm giving you a chance to get
21  your things out of the car.  I'm being nice.  It's a courtesy that I'm doing.  Because
22  you have to pay to get your personal property back tomorrow. It's a new state law
23  that we have to clean your car out and we have to inventory it and then we have to
24  store it.  So you have to pay for that." **This was a lie**, as Car Service LLC admits
25  there is no such law.  Trueblood Decl., Exh. 2, p. 30:13-25.

26      The second video also contains the following exchange:

27      Second Voice: "Let me get a hold of the bank and clear this up, I just made a
28  payment on Friday.  You can come back tomorrow."

15

1    First Voice: "I'm not coming back tomorrow.  *It's on camera*, it's already

2    hooked to my truck.  And so I'm takin' it either way."

3    Second Voice: "You can't take my !@#$ing car.  I made payment 5 days

4    ago!  I had no idea this was even a possibility!"

5    First Voice: "What's that?  *I can, it's being dollied right now*.  I'm trying to

6    be nice, if you grab me your keys you can take your stuff out of the car."

7    **The statement "It's on camera" was a lie**, because Car Service LLC admits

8    there was no camera on Kaufman's truck.  Trueblood Decl., Exh. 19, p. 14, Rog 22.

9    Kaufman, if he was the first voice, lied about the camera to deceive Sogn into

10   believing he had hooked up the truck, which he had not.  Kaufman lied to present a

11   *fait accompli* to Sogn, to trick him into giving up his keys so that the car could

12   *actually* be hooked up.

13   Kaufman also allegedly says on the second video: "I can, *it's being dollied*

14   *right now*."  If true, Kaufman is admitting in the second video, that at the time of

15   his first conversation with Sogn at the door (and Sogn's first objection), the car

16   actually *had not been* dollied and ready to tow. The statement that the car was

17   "being dollied now" by someone else, contradicts Kaufman's "Progress Report" he

18   submitted to Par after the repo.  Kaufman says there that *he* dollied the car in the

19   alley, at which time plaintiff jumped in the car to get his personal possessions.

20   Trueblood Decl., Exh. 17. Kaufman can't have it both ways.  Either *he* dollied the

21   car, as he said in the Progress Report, or *someone else* did, which is what he told

22   plaintiff.

23   Finally, Kaufman's overall credibility is in doubt because he has been

24   convicted of at least four crimes, including theft, criminal trespass, and two counts

25   of possession of stolen property. Request for Judicial Notice.  In the final analysis,

26   even Kaufman's own employer did not believe his story about the night of the

27   repossession.  Trueblood Decl., Exh. 2, p. 39:21-40:25; Exh. 6. Kaufman was

28   therefore suspended, and ultimately, fired.

16

1    Summary judgment is not appropriate when the opposing party offers

2    specific facts that call into question the credibility of the movant's witnesses.

3    Typeright Keyboard Corp. v. Microsoft Corp., 374 F.3d 1151, 1159 (Fed Cir.

4    2004); see also FRCP 56 Advisory Committee Note to 1963 Amendments ("Where

5    an issue as to a material fact cannot be resolved without observation of the

6    demeanor of witnesses in order to evaluate their credibility, summary judgment is

7    not appropriate"). If evidence presented on a summary judgment motion is subject

8    to conflicting inferences, one of which supports the party opposing the motion, the

9    motion must be denied.[6]

10    Thus, the court should not consider the two unauthenticated videos, or the

11    hearsay in them.  But if it does admit the videos, the jury should be the one to

12    weigh all the conflicting evidence and decide whether or not the car was fully

13    hooked up at the time Sogn objected.

14    C.    Kaufman Breached The Peace By Trying to Enter Plaintiff's Home

15    If the first video is admitted into evidence, it shows the repossession man

16    trying to open plaintiff's door and enter, *before* he rings the doorbell, at 21 seconds

17    into the video.  This was attempted criminal trespass at 2:30 a.m. (into a home with

18    a sleeping family), a crime for which Kaufman had been convicted before.  Any

19    unlawful entry into a building is a breach of the peace.[7]

20

21    [6] US v. Lange, 466 F.2d 1021 (9th Cir. 1972); US v. Perry, 431 F.2d 1020, 1022 (9th
Cir. 1970); Braxton-Secret v. A.H. Robins Co., 769 F.2d 528 (9th Cir. 1985)(if

22    reasonable people could differ on the significance of the evidence, MSJ must be
denied); Pepper & Tanner, Inc. v. Shamrock Broadcasting, Inc., 563 F.2d 391 (9th Cir.

23    1977) (A trial court may not enter a summary judgment that rests on a chain of
inferences from facts not conclusively established in the record).

24

25    [7] 4 James J. White & Robert S. Summers, *Uniform Commercial Code* § 34-8, at 386
(5th ed.2002)("In general, the creditor may not enter the debtor's home or garage
without permission"); Slowinski v. Valley Nat. Bank, 624 A.2d 85, 264 N.J.Super. 172

26    (N.J. Super. A.D., 1993)(same); Davenport v. Chrysler Credit Corp., 818 S.W.2d 23,
30 (Tenn.App.1991)("a breach of the peace is almost certain to be found if the

27    repossession is accompanied by the unauthorized entry into a closed or locked
garage"); Bloomquist v. First Nat'l Bank of Elk River, 378 N.W.2d 81, 83 (Minn.

28    1985)(removing a cracked window pane, that was taped shut, to enter debtor's closed
business); Gulf Oil Corp. v. Smithey, 426 S.W.2d 262, 265 (Tex.Civ.App.-Dallas,
1968)(entry into building by picking the lock was not peaceable).

D.   <u>Kaufman Breached The Peace By Threatening Plaintiff With Violence</u>

In the backyard, Kaufman threatened that he would physically stop Daniel if he tried to get his possessions out of the car.  Sogn Decl., ¶ 6. A repossessor "cannot resort to force, threats or intimidation to secure possession of mortgaged property, even though the terms of the contract entitle him to possession after default." <u>Id</u>. at 756. Actual violence is not required to find a breach of the peace under Washington law. <u>Stone Machinery</u>, supra, 1 Wn. App. at 754; <u>Ragde v. Peoples Bank</u>, 767 P.2d 949, 951 (Wa. 1989).

Defendants cite no case for their extreme position that if the vehicle was hooked up, subsequent threats of violence and attempted burglary are magically excused.  Fully securing the vehicle before the debtor objects may negate the repossessor's duty to retreat, but it does not give the repossessor a license to kill. Otherwise, the repo man could engage in whatever threats and violence he wanted, as long as the vehicle was fully attached.  No Washington case has made this artificial distinction, and UCC cases have held secured parties liable for misconduct occurring after the car was attached. <u>E.g</u>. <u>DeMary v. Rieker</u>, 302 N.J.Super. 208 (1997) (debtor thrown from the tow truck while trying to stop it).  The rule against a breach of the peace is intended to avoid violence. The potential for violence continues until the vehicle is not only attached, but completely towed away from the scene.  Until actual towing from the scene, the potential for confrontation remains high. The secured party cannot threaten or commit violence at any time, and the status of the vehicle hookup is irrelevant to that obligation.

E.   <u>Kaufman Breached The Peace By Threatening A False Police Report</u>

Kaufman also threatened to call the police and report that Daniel was armed. Sogn Decl., ¶ 7.  This was a false threat, never carried out.  The use of trickery is another traditional basis for finding a breach of the peace.[8]  Any participation of the

---

[8] <u>Big Three Motors, Inc. v. Rutherford</u>, 432 So.2d 483, 485 (Ala. 1983); <u>Davenport v. Chrysler Credit Corp.</u>, 818 S.W.2d 23, 29 (Tenn. 1991); <u>Giles v. First Virginia Credit Svcs.</u>, 560 S.E.2d 557, 565 (2002).

18

1    police in a repossession would be a breach of the peace. Speck, supra, 169 Wash. at

2    616.  Logically, so is a false threat to use the police in this way.

3    F.    Kaufman Breached The Peace By Creating A Loud Disturbance.

4          Kaufman also breached the peace by shouting and yelling threats in the

5    middle of the night, and then breaking into plaintiff's vehicle and setting off the car

6    alarm.  Sogn Decl., ¶¶ 6-7.  This is not a case of a stealth "night raid" as in Ragde

7    v. Peoples Bank, 53 Wash.App. 173 (1989), done out of sight of the debtor, with

8    some towing noise.  Rather, Kaufman was yelling at plaintiff inside his own yard in

9    a confrontation he had provoked by coming to plaintiff's door at 2:30 a.m.

10                      V.  ALASKA USA IS VICARIOUSLY LIABLE

11         RCW 62A.9A-609(b) prohibits the "secured party" from breaching the peace

12   during a self-help repossession.  The Official Comment to § 9-609 endorses the

13   view that the secured party is absolutely liable for breaches of the peace by others

14   its hires: "[C]ourts should hold the secured party responsible for the actions of

15   others taken on the secured party's behalf, including independent contractors

16   engaged by the secured party to take possession of the collateral." UCC 9-609, Off.

17   Comment., Note 3.  This is reiterated in the liability provisions of the UCC, which

18   afford damages to the consumer.  RCW 62A.9A-625.  The drafters commented in

19   this section that: "A person who has delegated the duties of a secured party but who

20   remains obligated to perform them is liable under this subsection." UCC 9-625 Off.

21   Comment, note 3.

22         The UCC thus directly adopts the "nondelegable duty" doctrine in regards to

23   the vicarious liability of a secured party ordering a repossession.  The nondelegable

24   duty doctrine, found at Restatement of Torts § 424, is a well-recognized exception

25   to the general rule that a principal is not liable for injuries caused by an

26   independent contractor. Millican v. N.A. Degerstrom, Inc., 313 P.3d 1215, 1219-20

27   (Wash. App., 2013).  As stated by the Washington Supreme Court: "When a statute

28   imposes a duty, or in inherently dangerous situations, an owner cannot delegate his

19

1   or her duty of care toward others to an independent contractor to escape liability."

2   Tauscher v. Puget Sound Power and Light Co., 96 Wn.2d 274, 277 (Wash., 1981).

3   Sea Farms, Inc. v. Foster & Marshall Realty, Inc., 42 Wn.App. 308, 314 (Wash.

4   App., 1985)(inherently dangerous); Kelley v. Howard S. Wright Const. Co., 90

5   Wn.2d 323, 332-33 (Wash. 1978)(statute).

6       In following the UCC Official Commentary, courts across the 50 states have

7   unanimously concluded that the secured party has a nondelegable duty not to

8   breach the peace.[9] The rationale in these cases is either that repossessions are

9   inherently dangerous activity, or that UCC 9-609 specifically imposes the duty on

10  the secured party. They have also concluded that the secured party (here, Alaska

11  USA) is responsible for the conduct of a second independent contractor (Car

12  Service LLC), who is hired by the first repossession agency (Par, Inc.), as occurred

13  in this case.[10]

14      In any event, there is a dispute of material fact whether Par and Car Service

15  L.L.C. were agents or independent contractors of Alaska USA. Alaska USA's own

16  contract with Par, Inc. recites that both Par and Car Service L.L.C. "shall act as

17  Client's agent" in the performance of any repossessions.  Trueblood Decl., Exh. 5,

18  p. 8, ¶ 8.  The term "PAR" in the contract is specially defined to include Par and its

19  "network of repossession contractors, subcontractors, and their respective

20  subcontractors and agents." Id., p. 1, ¶ 3. Thus, Alaska USA agreed by contract that

21  both Par and its subcontractor Car Service L.L.C. were its agents. One of the

22  agency factors is "whether or not the parties believe they are creating the relation of

23  master and servant." Massey v. Tube Art Display, Inc., 551 15 Wn.App. 782, 786

24

25

---

26  [9] E.g. Henderson v. Security Nat'l Bank, 72 Cal.App.3d 764, 770 (1977); Nichols v.
    Metropolitan Bank, 435 N.W.2d 637, 640-41 (Minn. 1989); Daniel v. Morris, 181

27  So.3d 1195, 1198 (Fla. App., 2015); Rand v. Porsche Fin. Servs., 216 Ariz. 42 (Ariz.
    2007); MBank El Paso, N.A. v. Sanchez, 836 S.W.2d 151, 153 (Tex. 1992); Massengill

28  v. Indiana Nat'l Bank, 550 N.E.2d 97, 99 (Ind. App.1990); McCall v. Owens, 820
    S.W.2d 748, 751-52 (Tenn. App. 1991); Hester v. Bandy, 627 So.2d 833 (Miss. 1993).

1   (Wash. App. 1976). That factor favors plaintiff in this case, and the agency dispute

2   must therefore go to the jury. Durias v. Boswell, 58 Wn.App. 100, 104-5 (Wash.

3   App., 1990)(reversing summary judgment because agency question is for the jury,

4   and no one factor is conclusive or controlling).

5       The only evidence Alaska USA submitted to show that Car Service L.L.C.

6   was an independent contractor of Par, Inc. is an unauthenticated "independent

7   contractor" agreement between Par and an entity called Careful Asset Recovery

8   Service, Incorporated. But the latter was *not* the entity that conducted the

9   repossession, for it went bankrupt and ceased to exist in 2014, long before the

10  repossession.  Trueblood Decl., Exh. 2, p. 12:7-13:15, 16:8-14; Exh. 19, Rog 2;

11  Exh. 3, p. 10:7-20; RJN Exh. 6.  There is no written agreement between Car

12  Service L.L.C. and Par.  Trueblood Decl., Exh. 2, p. 17:8-13, 38:5-15; Exh. 3, p.

13  32:17-33:7. And, Alaska USA disclaimed any knowledge at deposition about the

14  Par - Car Service L.L.C. relationship.  Trueblood, Exh. 4, p. 10:9-11:19, 114:4-6.

15      Moreover, two traditional agency factors suggest that Car Service L.L.C. was

16  indeed an agent of Par, Inc. in conducting the repossession: (1) whether the place of

17  work was provided by the employer; and (2) whether or not the work is part of the

18  regular business of the employer. Massey, supra, at 786.  As to number one, Par

19  provided Car Service L.L.C. with rent-free offices and a lot in Auburn, which is

20  owned by one of Par's sister companies, which was where plaintiff redeemed his

21  vehicle. Trueblood Decl., Exh. 2, p. 15:18-16:7; Exh. 3, p. 70:12-71:21.  As to

22  number two, Car Service L.L.C. and Par, Inc. are both repossession agencies, in the

23  business of repossessing collateral on consumer loans.  Trueblood Decl., Exh. 2, p.

24  12:18-14:23; Exh. 3, p. 19:7-23, 23:5-24:3; Exh. 5.

25      VI.  PLAINTIFF IS ENTITLED TO EMOTIONAL DISTRESS DAMAGES

26  A.   Fair Debt Collection Practices Act Claim

27

28  [10] Clark v. Associates Comm. Corp., 877 F.Supp. 1439, 1445-48 (D. Kan. 1994); Allstate Ins. Co. v. Ford Motor Credit Co., 236 Fed Appx. 405 (10th Cir. 2007); Geeslin v. Nissan Motor Acceptance Corp., 1998 WL 433932 (N.D. Miss., June 3, 1998).

1   The FDCPA unquestionably covers[11] repossession agencies like Car Service

2   L.L.C., and authorizes an award of emotional distress damages to the injured

3   consumer, under its provision authorizing "actual damages." 15 U.S.C. §

4   1692k(a)(1); McCollough v. Johnson, Rodenburg & Lauinger, LLC, 637 F.3d 939,

5   957 (9th Cir. 2011)(approving jury instruction stating actual damages includes

6   personal humiliation, embarrassment, mental anguish and emotional distress, and

7   upholding $250,000 emotional distress award).

8   B.    Uniform Commercial Code Claim

9   When confronted with a question of availability of emotional damages under

10  a statutory claim, Washington courts look to the "language of the particular statute

11  at issue." White River Estates v. Hiltbruner, 953 P.2d 796, 798 (1998).

12  The UCC provides that "a person is liable for damages in the amount of *any*

13  *loss* caused by a failure to comply with this Article."  RCW 62A.9A-625(b)

14  (emphasis added).  The statute's plain meaning is that emotional distress damages

15  are available. No judicial decision in the 50 states has ever interpreted the words

16  "any loss" to exclude emotional distress damages. The drafters specifically used

17  "any loss," not "any pecuniary loss." The UCC must be liberally construed. RCW

18  62A.1-103.

19  The Official Commentary to UCC 9-625 provides: "Subsection (b) supports

20  the recovery of *actual damages* for committing a breach of the peace in violation of

21  9-609, and principles of tort law supplement this subsection." Off. Comment. No.

22  3, UCC § 9-625 (emphasis added). The term "actual damages" includes emotional

23  distress damages under the generally accepted legal meaning. Rasor v. Retail Credit

24  Co., 87 Wn.2d 516, 529 (Wash., 1976)(FCRA); Ellingson v. Spokane Mortg. Co.,

25  19 Wn.App. 48, 57 (Wash. App., 1978)(anti-discrimination statute).

26

27  [11] The FDCPA prohibits repossession agencies from breaching the peace, for doing so
    eliminates the "present right of possession" of the collateral. 15 U.S.C. §§ 1692a(6)

28  and 1692f(6); Jordan v. Kent Recovery Serv., Inc., 731 F.Supp. 652, 656-658 (D. Del.
    1990).

1   Moreover, the general "principles of tort law" referenced in the UCC

2   commentary also authorize recovery of emotional distress for wrongful

3   repossessions. Sherwood v. Bellevue Dodge, Inc., 35 Wn.App. 741, 748-749

4   (Wash. App., 1983)(intentional infliction of emotional distress claim).

5   Since the UCC damages provision is not ambiguous in granting emotional

6   distress, the court never reaches the issue of whether the wrong committed is more

7   like an intentional tort, or a negligence claim.[12]

8   C.   Consumer Protection Act Claim

9   Emotional distress is recoverable under the CPA, as long as the plaintiff has

10  also suffered pecuniary loss.  It is only when there is no loss to plaintiff's business

11  or property at all, that emotional distress is unrecoverable. Keyes v. Bollinger, 31

12  Wn.App. 286, 294-296 (Wash. App., 1982).  Plaintiff has suffered pecuniary loss,

13  in the form of loss of use of his vehicle and payment of $765 in repossession fees.

14  Sogn Decl., ¶ 9.  The CPA's property injury requirement is met by even minimal

15  out of pocket losses, and by a temporary loss of use of property. Mason v.

16  Mortgage Am., Inc., 114 Wash.2d 842, 854 (1990) (temporary loss of use of

17  property while brokerage company improperly withheld title constituted sufficient

18  injury under CPA); Tallmadge v. Aurora Chrysler Plymouth, Inc., 25 Wn.App. 90,

19  93-94 (Wash. App. 1979)(awarding damages for inconvenience when plaintiff

20  suffered loss of use and enjoyment of his vehicle).

21  VII.  PLAINTIFF IS ENTITLED TO RECOVER UNDER THE CPA

22  A wrongful repossession constitutes a *per-se* violation of the CPA. Sherwood

23  v. Bellevue Dodge, Inc., 35 Wn.App. 741, 747 (Wash. App. 1983)("We hold that

24  an unsecured party's non-judicial repossession of a motor vehicle affects the public

25  interest, *per se*"). The elements of a *per-se* CPA claim are: (1) the existence of a

26  pertinent statute; (2) its violation; (3) that the plaintiff was within the class of

27

28  [12] White River Estates, supra 134 Wash.2d at 798. In any event, the wrongs committed
    in a breach of the peace are typically trespass, conversion, assault, or IIED, all of which
    are intentional torts.                                    23

1  people the statute sought to protect; and (4) that such violation was the proximate

2  cause of damages to business or property. <u>Sherwood v. Bellevue Dodge, Inc</u>., 35

3  Wn.App. 741, 745  (Wash. App. 1983); <u>Dempsey v. Joe Pignataro Chevrolet, Inc</u>.,

4  22 Wash.App. 384, 393, 589 P.2d 1265 (1979).

5       The first two elements are satisfied because a non-judicial repossession in

6  breach of the peace violates RCW § 62A.9A-609(b)(2), which establishes a public

7  policy against unlawful repossessions.  <u>Sherwood</u>, <u>supra</u>, 35 Wn.App. at 747

8  (Wash. App. 1983)("Thus, the first two elements of a per se violation, the existence

9  of a pertinent statute and its violation, were established in the trial court.").  The

10  third element is also satisfied: plaintiff is a borrower whose loan is governed by the

11  UCC, within the protected class. <u>Sherwood,</u> at 748; RCW § 62A.9A-609(b)(2).

12       Kaufman violated the statute by committing both "unfair" and "deceptive"

13  practices.  A breach of the peace is a specific "unfair" practice under federal law

14  (15 U.S.C. § 1692f(6)), and also a *per-se* violation of the CPA under state law.

15  <u>Sherwood</u>, <u>supra</u>. It was certainly "unfair" to threaten plaintiff with violence, and

16  attempt to trespass into his home. Kaufman also used deception, by telling many

17  lies designed to trick plaintiff into giving up his keys: (1) that he had a camera on

18  the truck; (2) that the vehicle was "being dollied" while he and plaintiff were in the

19  back yard; (3) that he would call the police, and (4) that a "new state law" required

20  plaintiff to pay for his personal items. This was the proximate cause of damages to

21  his business or property, including six days loss of use of the car, and repossession

22  fees. Sogn Decl., ¶ 9; Trueblood Decl., Exh. 3, p. 72:7-12; <u>Dennis v. Southworth</u>, 2

23  Wash.App. 115, 124-25 (1970) (loss of use damages for wrongful repossession).

24  Dated:  July 19, 2018                    _s/Alexander B. Trueblood

25                                          Alexander B. Trueblood #50612
                                            1700 Seventh Ave, Ste 2100
26                                          Seattle, Washington 98101
                                            Telephone:  (206) 707-9685
27                                          Fax:  (206) 832-4676
                                            E-mail: alec@hush.com
28                                          Attorneys for Plaintiff Daniel Sogn

24